JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Antonio Hooks, appeals a judgment from the Cuyahoga County Court of Common Pleas finding him guilty of murder with one-, three-, and five-year firearm specifications and sentencing him to twenty-three years to life in prison. After reviewing the facts and the pertinent law, we affirm.
 {¶ 2} On December 8, 2005, the Cuyahoga County Grand Jury indicted Hooks on one count of aggravated murder, in violation of R.C.2903.01(A), with one-, three-, and five-year firearm specifications, and having weapons while under a disability, in violation of R.C.2923.13(A)(3). He entered a plea of not guilty to the charges.
 {¶ 3} On July 25, 2006, Hooks waived his right to a jury trial on the charge of having weapons while under a disability and stipulated to his prior conviction. That *Page 3 
same day, a jury and bench trial commenced and the following testimony was offered at trial.
 {¶ 4} The state first presented Dr. Andrea McCollom ("Dr. McCollom"), deputy coroner of the Cuyahoga County Coroner's office ("CCCO"). She determined that on November 2, 2005, Frank Harris-Comer ("victim") died of a gunshot wound to the back of his head. She ruled that his death was a homicide.
 {¶ 5} Shuree Stamper testified that Hooks was her boyfriend from March 2005 until November 2005.[1] She stated that Hooks' half brother, Stafonze Robinson, owned a yellow and blue Cutlass with "spinners"on the tires. She had not seen another Cutlass painted those colors. She further stated that "[Robinson] didn't let — never seen anybody else drive it. * * * It was his prize possession."
 {¶ 6} Stamper testified that Hooks drove her to work every day beginning at 8:00 a.m. and at 4:30 p.m., he picked her up from work. On November 2, 2005, Hooks drove her to work in her Plymouth Breeze. Between 3:00 and 3:30 p.m., she spoke with Hooks on the phone and he told her that he would pick her up at 4:30 p.m. But Hooks did not pick her up, so she walked to Robinson's apartment. When she arrived, she saw her car, Robinson's Cutlass, the police, Robinson, and Robinson's girlfriend, Rashanda Shepard, outside Robinson's apartment. She said that she did not see Hooks and did not talk to him for three days after that. *Page 4 
 {¶ 7} She also stated that although Hooks and Robinson look alike, "[Robinson] may be a shade darker. [Robinson] don't have facial hair. [Robinson] is roughly a little shorter. [Hooks] is bigger in size." She said that Hooks was twenty-four years old and that Robinson was approximately the same age.
 {¶ 8} Shepard testified that in November 2005, she lived with Robinson. She confirmed that Robinson owned a yellow and blue Cutlass, but stated that he allowed Hooks to drive it.
 {¶ 9} Shepard explained that on November 2, 2005, Hooks drove to her apartment in Stamper's car. She later saw Hooks driving Robinson's Cutlass between 3:00 p.m. and 3:30 p.m. Hooks returned to her apartment and parked the Cutlass. She said Hooks walked into the apartment, gave the keys back to Robinson, and washed his hands. She testified that Hooks said, "[n]iggers think he's sweet." She stated that sweet is slang for "they think he a punk or soft or something." She described Hooks as "shaky and nervous."
 {¶ 10} Shepard then walked outside because she saw the police handcuffing Robinson in the parking lot. The police asked her who had just driven the Cutlass and she replied, "Jaws[,]" which she explained was Hooks' nickname. She told the police that "Jaws" was in her apartment, but she said that the police did not find him.
 {¶ 11} Shepard stated that when she went outside, the window in the back of her apartment had a screen in it. But when she returned, she said that her blinds *Page 5 
were spread apart and the window was wide open. She also stated that she later met with a detective and identified Hooks from a photo array.
 {¶ 12} Robinson testified that he has a teardrop tattoo by his left eye and then he showed it to the jury. In November 2005, he lived at 7700 Woodland Avenue, apartment E3 and owned a yellow and blue Cutlass. He stated that Hooks is his half brother.
 {¶ 13} Robinson testified that on November 2, 2005, he and Hooks worked on the Cutlass and put a spinner in the back seat. Robinson stated that he then went to visit a friend. While at his friend's apartment, he called Hooks' cell phone and Hooks said that he was test driving the Cutlass.
 {¶ 14} Hooks returned to Robinson's apartment and Robinson saw him park the Cutlass. Robinson stated that Hooks gave him the car keys and walked toward a store, but Robinson did not actually see where he went. Robinson then said that police cars pulled up. He approached the police and they handcuffed him and put him in the back of a zone car. He stated that the last time he drove the Cutlass, there was not a juice bottle under the arm rest.
 {¶ 15} On cross-examination, Robinson testified that he allowed Hooks to drive the Cutlass one time prior to November 2, 2005. He stated that he did not see Hooks with a gun that day.
 {¶ 16} Roscoe Simmons testified that on November 2, 2005, at 3:30 p.m., he saw the yellow and blue Cutlass facing him, in the same lane, at the intersection of *Page 6 
Sophia Avenue and East 102nd Street. He stated that the driver was talking to a group of people on the street. He observed the driver fire "[a] silver automatic" gun five or six times when he "sped off." He stated that the driver shot from over his left shoulder, turning his head in the direction he fired. Simmons saw the man that had been shot as a result of the shooting. Simmons further explained that he saw one man inside the Cutlass, whom he described as "[l]ight skinned. Medium build." He also said that the driver wore a backwards baseball hat.
 {¶ 17} Joann Sharp testified that on November 2, 2005, at 3:35 p.m., she walked out of her mother's house, which was located near the area of the crime scene, and saw Hooks wearing a backwards baseball hat and driving the yellow and blue Cutlass at approximately forty to forty-five miles per hour. She then drove down Sophia Avenue, toward East 102nd Street, and stopped when a young girl, B.Y., approached her car and told her that the victim had been shot.
 {¶ 18} Sharp testified, "[Robinson], he is much smaller than his brother, and he got a tattoo up on his face like teardrops, and his face is much slimmer, his eyes are much darker, it is like a lot different from him." She stated that Hooks does not have tattoos on his face.
 {¶ 19} B.Y., a twelve-year-old girl, testified that on November 2, 2005, she and a friend, N.G., were talking in the area of Sophia Avenue and East 102nd Street. B.Y. saw a male in the yellow and blue Cutlass pull up to the victim and six other males. She stated that the driver said something to the victim and the victim replied, *Page 7 
"[s]top coming up in my hood." She described the driver as African-American, light skinned, older then her, and wearing a black T-shirt.
 {¶ 20} B.Y. testified that ten minutes later, she saw the same man drive the Cutlass down East 102nd Street again. She stated that the driver said to the victim, "I should shoot your [bitch ass]." The victim replied, "[d]o what you got to do." The driver then "pulled a gun and started shooting and that's when [the victim] tried to run and he cut the tree and slipped." She stated that the Cutlass drove away "fast." B.Y. then walked home, saw Sharp, and told her that the victim had been shot.
 {¶ 21} N.G., a sixteen-year-old girl testified that on November 2, 2005, she and B.Y. stood on the corner of Sophia Avenue and East 102nd Street. She saw a male driving the yellow and blue Cutlass and stated, "[the victim] gave him two thumbs down and then he reversed his car, came back and they started arguing, and then he said, `I'll be back.' He went around the corner, came back, and then he said, `I should shoot you.' Then [the victim] said, `[d]o it.' And then his gun, when he tried to shoot out the window his gun got stuck so he started moving it, then he started shooting everywhere." She said that the male drove away at approximately thirty to thirty-five miles per hour.
 {¶ 22} N.G. further explained that the second time the driver came back, he pulled up to the victim on the wrong side of the street. She also said that the driver stuck the gun out of the car window and shot approximately four times in the *Page 8 
direction the victim was running. She stated that the victim was the only person in the yard when he got shot.
 {¶ 23} N.G. said that detectives interviewed her and she identified Hooks from a photo array as the shooter.[2] She also described the shooter as tall, African-American, light skinned, and had short hair. She described the gun as small and black and stated the shots fired "one after another."
 {¶ 24} Eric Roberts ("Officer Roberts"), a Cleveland police officer, testified that on November 2, 2005, he and his partner were patrolling the area of Sophia Avenue and East 102nd Street. They saw a man lying on the ground, bleeding profusely, and gasping for air. They called EMS and additional police officers. He interviewed witnesses and they provided a description of the shooter's vehicle, which he then broadcasted over the police radio.
 {¶ 25} Daniel Brill ("Officer Brill"), a Cleveland police officer, testified that on November 2, 2005, at approximately 4:00 p.m., he heard a radio broadcast that a shooting had occurred and a description of a yellow and blue Oldsmobile. He and his partner saw the vehicle at 7700 Woodland Avenue. He stated that the police questioned Shepard and Robinson, the owner of the Cutlass, outside of their apartment and they took Robinson into custody. *Page 9 
 {¶ 26} That same date, Officer Brill searched their apartment for the suspect. He saw a window in the rear of the apartment and stated, "[t]here had been a screen that was removed, the window had been slid open, and it appeared that someone may have exited through that window."
 {¶ 27} Christine Rayburn, ("Detective Rayburn") of the Cleveland Crime Scene Unit ("CSU"), testified that on November 2, 2005, she photographed the crime scene area, collected two swabs of blood from the area where the victim was shot, four shell casings, and a soda can. She also retrieved two fingerprints from the soda can. Next, she went to 7700 Woodland Avenue and photographed the Cutlass. Later that same date, she reported to the Homicide Unit and conducted a gun shot residue test on Robinson.
 {¶ 28} Melvin Smith, ("Detective Melvin Smith") of the Cleveland Homicide Unit, testified that on the date of the shooting, he interviewed witnesses at the crime scene. He then responded to 7700 Woodland Avenue and searched apartment E3. He observed that a back window was open and a window screen lying on the ground behind the apartment. He concluded that someone had fled out of the back window when the police arrived.
 {¶ 29} Michael Smith, ("Detective Michael Smith") of the Cleveland Homicide Unit, testified that on November 2, 2005, he and his partner, James Rodes ("Detective Rodes"), examined the crime scene and determined that the shooter fired a semiautomatic gun. Later at the police station, he said that Robinson and *Page 10 
Shepard provided statements, and thus, Hooks became the suspect. Police eventually arrested Hooks and he completely denied being in the area of Sophia Avenue and East 102nd on November 2, 2005. He also totally denied being at Robinson's apartment on that same day, and said that Robinson only let him drive the Cutlass if Robinson was also in it. He further denied that on November 2, 2005, he drove Stamper to work and was suppose to pick her up.
 {¶ 30} On cross-examination, Detective Michael Smith explained that the police never found the semiautomatic gun.
 {¶ 31} Timothy Entonok, ("Detective Entonok") of the Cleveland Homicide Unit, testified that he put photos of Robinson and Hooks in photo arrays and N.G. identified Hooks as the shooter. On cross-examination, Detective Entonok testified that Robinson's tattoo could not be seen in the photo array.
 {¶ 32} Humphrey Caswell, ("Detective Caswell") with the CSU, testified that he photographed the Cutlass and retrieved five fingerprints from it.
 {¶ 33} Jill Ryan, a latent fingerprint examiner with the CSU, testified that she examined fingerprints submitted by Detective Caswell and compared them to a known print of Hooks. She stated that Hooks' print matched a print retrieved from a spinner, which was found in the back seat of the Cutlass. She could not positively identify any other prints retrieved from the Cutlass or from the two prints lifted off the soda can. *Page 11 
 {¶ 34} Curtiss Jones, a forensic scientist with the CCCO, testified that he collected swabs from the opening of the soda can found at the crime scene and a juice bottle found inside the Cutlass under the front seat arm rest. He submitted the swabs for DNA testing. He also determined that the results of the gunshot residue test conducted on Robinson were negative. Further, Jones examined the Cutlass, but did not detect the presence of gunshot residue inside or outside the car. He stated that if a gun was shot outside a car window and the car drove away at a high rate of speed, he would not expect to find gunshot residue on the interior or exterior of the car.
 {¶ 35} Carey Martin, a forensic scientist with the CCCO, stated that she tested a blood standard from the victim, the swab of the soda can, the juice bottle, and a water bottle, as well as the oral standard from Hooks. She concluded that the juice bottle swab matched the DNA profile of Hooks, but the soda can and water bottle swabs did not match Hooks or the victim.
 {¶ 36} On cross-examination, Martin explained that DNA testing does not reveal how long a sample of DNA has been on an item.
 {¶ 37} After calling witnesses, the state rested its case. Hooks then moved the trial court for Crim.R. 29 acquittal arguing that the state did not prove that Hooks committed the offenses and also that the state did not establish that the murder was committed with prior calculation and design. The state objected and the trial court denied the motion. *Page 12 
 {¶ 38} Hooks then requested to call Detective Michael Smith as a witness, to read a statement made by a juvenile witness, C.H., to another officer, Detective Rodes. The state objected and the court denied the request. Hooks, without calling any witnesses, rested his case and renewed his Crim.R. 29 motion, which the trial court again denied. The state and defense agreed to add the lesser included offense of murder, in violation of R.C. 2903.02(A), with one-, three-, and five-year firearm specifications.
 {¶ 39} On August 4, 2006, the jury returned a guilty verdict to the lesser included offense of murder, finding that the mandatory one-, three-, and five-year firearm arm specifications applied. Separately, the trial court found Hooks guilty of having weapons while under a disability.
 {¶ 40} That same day, the trial court sentenced Hooks to the mandatory sentence of fifteen years to life in prison for murder. In addition, the court merged the one- and three-year firearm specifications for sentencing purposes and ordered that the three-year firearm specification run consecutive to the five-year firearm specification, for a total of eight years in prison on the firearm specifications, to be served prior to and consecutive with the murder prison term. The court also sentenced Hooks to five years in prison for having weapons while under a disability and ordered it to be served concurrently to the other terms, for an aggregate sentence of twenty-three years to life in prison. Finally, the trial court informed *Page 13 
Hooks at the sentencing hearing, that he would be required to serve five years of post-release control following his release from prison.
 {¶ 41} It is from this judgment that Hooks appeals and asserts the following assignments of error:
 {¶ 42} "[1.] The trial court erred in denying Appellant's motion for acquittal as to the charges when the State failed to present sufficient evidence to sustain a conviction.
 {¶ 43} "[2.] Appellant's convictions are against the manifest weight of the evidence.
 {¶ 44} "[3.] The trial court erred by violating Appellant's right to present a complete defense when it refused to allow evidence to be introduced which showed that someone else other than Appellant was the shooter.
 {¶ 45} "[4.] The trial court erred when it sentenced Appellant consecutively on two firearm specifications."
 {¶ 46} In his first assignment Hooks argues that the trial court erred when it denied his motion for acquittal because the evidence was not sufficient to show that he caused the victim's death or was in possession of a firearm.
 {¶ 47} In State v. Thompkins (1997), 78 Ohio St.3d 380, 386, the Supreme Court of Ohio explained that sufficiency of the evidence and weight of the evidence are not synonymous legal concepts. They are "both quantitatively and qualitatively different." Id. *Page 14 
 {¶ 48} The high court further explained:
 {¶ 49} "[w]ith respect to sufficiency of the evidence, `sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed.1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v.Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process.Tibbs v. Florida (1982), 457 U.S. 31, 45
* * *, citing Jackson v. Virginia (1979), 443 U.S. 307
* * *." (Parallel citations omitted.) Id. at 386-387.
 {¶ 50} When determining sufficiency of the evidence, we must consider whether, after viewing the probative evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. State v.Shaffer, 11th Dist. No. 2002-P-0133, 2004-Ohio-336, at ¶ 17. Further, we note that the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. State v. Dennis (1997),79 Ohio St.3d 421, 430. *Page 15 
 {¶ 51} Hooks was convicted of one count of murder, in violation of R.C. 2903.02(A), which provides, "[n]o person shall purposely cause the death of another * * *." He was also convicted of one count of having weapons while under a disability, in violation of R.C. 2923.13(A)(3), which provides, "* * * no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance if * * * [t]he person * * * has been convicted of any offense involving the illegal possession * * * [of] any drug of abuse * * *."
 {¶ 52} A review of the record indicates that, in a light most favorable to the prosecution, there was sufficient evidence to support Hooks' conviction beyond a reasonable doubt. The state presented an abundance of evidence that on November 2, 2005, at approximately 3:30 p.m., Hooks drove Robinson's blue and yellow Cutlass to Sophia Avenue and East 102nd Street. Hooks argued with the victim and as Hooks drove away, he shot a semiautomatic gun several times out of the Cutlass window, toward the victim. The victim died at the scene of a single gunshot wound to the back of his head.
 {¶ 53} The testimony also establishes that when Hooks returned to Robinson's apartment, he washed his hands, and said "[n]iggers think he's sweet." Police arrived at the apartment soon after and searched for Hooks, but did not find him. The back window in the apartment was open, the screen was removed, and the blinds were separated. Hooks was supposed to pick Stamper up from work at 4:30 p.m., but he never showed up. *Page 16 
 {¶ 54} The evidence also shows that Hooks was seen driving the Cutlass at the time and location of the shooting. An eye witness, N.G., identified Hooks from a photo array as the shooter. Further, DNA from a juice bottle, found under the front seat arm rest of the Cutlass, matched Hooks' DNA profile, putting him in the automobile. Additionally, Hooks' fingerprint matched a print retrieved from a spinner, which was found in the back seat of the Cutlass. Hooks also stipulated to his prior conviction for possession of drugs, in violation of R.C. 2925.11.
 {¶ 55} After reviewing the evidence, in a light most favorable to the state, as well as the respective elements of the offenses, we conclude that the evidence was sufficient to convict Hooks of murder and having weapons while under disability, beyond a reasonable doubt. Thus, Hooks' first assignment of error is overruled.
 {¶ 56} In his second assignment of error, Hooks asserts that his convictions were against the manifest weight of the evidence.
 {¶ 57} In Thompkins, supra at 387, the Supreme Court of Ohio stated:
 {¶ 58} "[although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. [State v. Robinson (1955), 162 Ohio St. 486, 487]. Weight of the evidence concerns `the inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they *Page 17 
shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 {¶ 59} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. [Tibbs v.Florida, 457 U.S. 31, 42]. See, also, State v. Martin (1983),20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')."
 {¶ 60} With this standard in mind, we conclude that Hooks' convictions were not against the manifest weight of the evidence. Hooks argues that the eye witnesses who identified him were wrong because he looks similar to Robinson. But, the testimony demonstrates that Hooks is taller and bigger in size, he has a lighter complexion, and he does not have any tattoos on his face. Moreover, the testimony showed that Hooks drove the yellow and blue Cutlass to Sophia Avenue and East 102nd Street, where he and the victim exchanged words. Several witnesses saw *Page 18 
Hooks drive away and shoot several times out of the car window, toward the victim. The victim died of a gunshot wound to the back of his head.
 {¶ 61} After reviewing the testimony, we conclude that the trier of fact did not lose its way and create a manifest miscarriage of justice. Further, the amount of reliable and consistent evidence presented by the state outweighed any inconsistencies in testimony and substantially supported each conviction. Accordingly, Hooks' second assignment of error is overruled.
 {¶ 62} In his third assignment of error, Hooks argues that the trial court violated his right to present a complete defense when it refused to allow evidence that someone other than Hooks was the shooter.
 {¶ 63} An appellate court, which reviews the trial court's admission or exclusion of evidence, must limit its review to whether the lower court abused its discretion. State v. Finnerty (1989),45 Ohio St.3d 104, 107. Abuse of discretion connotes more than an error of law, it implies that the trial court acted unreasonably, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 64} Specifically, Hooks asserts that the trial court should have submitted a police report to the jury, which had a statement made by a juvenile witness, C.H., that the shooter had one or two teardrop tattoos beneath one or both eyes. However, the state argues that the police summary of C.H.'s oral statement is hearsay, because C.H. gave the statement to Detective Rodes and defense counsel attempted to elicit the statement from a different officer, Detective Michael Smith. *Page 19 
Further, the state contends that the statement does not fall under any hearsay exceptions and does not possess the guarantees of trustworthiness.
 {¶ 65} Few rights are more fundamental than that of an accused to present a defense and his version of the facts. Webb v. Texas
(1972),409 U.S. 95, 98. When exercising that right, the accused must comply with the standard rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.Chambers v. Mississippi (1973), 410 U.S. 284, 302.
 {¶ 66} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Further, Evid.R. 802 provides that "[h]earsay is not admissible except provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio."
 {¶ 67} The hearsay rule is based upon the notion that untrustworthy evidence should not be presented to the trier of facts.Chambers, supra, at 298. Out-of-court statements are traditionally excluded because they lack reliability. Id. They lack reliability because they were not made under oath or other circumstances that stress the seriousness of the matter by guarding against a lie with the possibility of a penalty of perjury, the declarants words are not subject to cross-examination, and *Page 20 
the trier of fact cannot assess the declarant's demeanor and credibility. California v. Green (1970), 399 U.S. 149, 158.
 {¶ 68} In the case sub judice, C.H.'s oral statement was hearsay, and therefore, not admissible. C.H. made the statement to Detective Rodes at the scene of the crime. Defense counsel attempted to elicit C.H.'s statement from Detective Michael Smith when he testified at trial, but he was not the person whom obtained the statement from C.H., so he could not testify to the hearsay. Moreover, C.H.'s statement does not fall under any of the hearsay exceptions.
 {¶ 69} Therefore, we conclude that the trial court did not abuse its discretion when it excluded the statement of C.H. Thus, Hooks' third assignment of error is overruled.
 {¶ 70} In his fourth assignment of error, Hooks contends that the trial court erred by sentencing him consecutively on the three- and five-year firearm specifications for the same offense.
 {¶ 71} R.C. 2941.145(A), "Specification that offender displayed, brandished, indicated possession of or used firearm[,]" requires a three-year prison term if "the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense." R.C. 2941.146, "Specification that offender discharged a firearm from a motor vehicle[,]" mandates a five-year prison term "for committing a felony that *Page 21 
includes, as an essential element, purposely or knowingly causing * * * the death of * * * another and that it was committed by discharging a firearm from a motor vehicle
 {¶ 72} Pursuant to R.C. 2929.14(D)(1)(a) and (b), the court shall impose one of the mandatory prison terms listed in R.C. 2941.141 or2941.145 if the offender is convicted of the felony and specifications.[3] However, the court may not impose more than one of these mandatory prison terms for firearm specifications for felonies committed as part of the same act or transaction. Furthermore, under R.C. 2929.14(D)(1)(c), the court "shall impose an additional prison term of five years[,]" when the defendant is found to have violated R.C.2941.146.
 {¶ 73} Moreover, under R.C. 2929.14(E)(1)(a), "if both types of mandatory prison terms are imposed [under R.C. 2929.14(D)(1)(a) and2929.14(D)(1)(c)], the offender shall serve any mandatory prison term imposed under either division consecutively to any other mandatory prison term imposed under either division * * * consecutively to and prior to any prison term imposed for the underlying felony * * *."
 {¶ 74} In State v. Bates, 10th Dist. No. 03AP-893, 2004-Ohio-4224, at _10, the court concluded, "[a]s murder is a felony that includes the element of purposely causing the death of another, R.C.2929.14(D)(1)(c) and (E)(1)(a) require the court to *Page 22 
impose both a five-year and a three-year mandatory prison term, to be served consecutively." This court has also determined that, "it is clear that the legislature intended to cumulate the mandatory prison terms contained in R.C. 2941.141 and .145, on the one hand, and R.C. 2941.146, and to require them to be served consecutively to one another and to the prison terms on the base offense." State v. Gresham, 8th Dist. No. 81250, 2003-Ohio-744, at _16.
 {¶ 75} In the instant case, the jury found Hooks guilty of murder, in violation of R.C. 2903.02, with the firearm specifications, in violation of R.C. 2941.141, 2941.145, and 2941.146. At the sentencing hearing, the trial court merged the one-year firearm specification with the three-year firearm specification. Since Hooks purposely caused the death of another by discharging a firearm from a motor vehicle, and R.C.2929.14(D)(1)(c) and 2929.14(E)(1)(a) require the court to impose a five-year and a three-year mandatory consecutive prison term for the firearm specifications, the trial court properly sentenced Hooks. Thus, Hooks' fourth assignment of error is overruled.
 {¶ 76} Accordingly, the judgment of the Cuyahoga County Court of Common Pleas is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's *Page 23 
conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., A.J. and MARY EILEEN KILBANE, J., CONCUR
[1] State and defense counsel stipulated to Stamper's in-court identification of Hooks.
[2] N.G. made an in-court identification of Hooks as the shooter.
[3] R.C. 2941.141, "Specification that offender had a firearm while committing the offense[,]" requires a one-year mandatory prison term if the offender was found to have violated the specification. In the case at bar, the trial court merged the one-year firearm specification with the three-year firearm specification. *Page 1